**UNITED STATES of America, Plaintiff,**

v.

**William STEPHENSON, Kathleen Marria, Wendy Courech, Timothy Greening, Rudolpho Longo, Robert Vukson and Orville Walters, Defendants.**

Crim. A. No. 78–80788.

United States District Court, E. D. Michigan, S. D.

Oct. 22, 1979.

See also, D.C., 490 F.Supp. 625.

James K. Robinson, U. S. Atty., Samuel C. Damren, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Marvin Skupski, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING MOTION TO SUPPRESS AND QUASH SEARCH WARRANT

JULIAN ABELE COOK, Jr., District Judge.

The first Count of the Indictment in this case charges the several Defendants with conspiracy to manufacture, to possess with intent to distribute, and to distribute a controlled substance; to wit, phencyclidine (PCP). There also are six ancillary substantive Counts.

The Defendants, Vukson and Longo, now seek to have the items, which were seized pursuant to a search warrant for the premises located at 529–31 Greyfriars, Detroit, Michigan, suppressed. The attack upon this warrant is not predicated upon any allegation of extrinsic defect, but rather upon the contention that the items which were seized are the "fruits of a poisonous tree." The Defendants' Motion brings several questions within its purview regarding the Constitutional parameters to be placed upon the use of transponder devices ("beepers") for surveillance purposes by law enforcement officials. The Court conducted an evidentiary hearing in conjunction with the Motion.

Drug Enforcement Administration Agent Steven Casteele testified that on June 1, 1976, the Drug Enforcement Administration received a telephone call from the Abbott Chemical Company, of Chicago, Illinois, who indicated that they had received a large and, hence, suspicious order of a chemical, commonly known to be a precursor to the manufacture of phencyclidine from Progressive Development, Inc. The chemical is not a controlled substance. On June 7, 1976, he took two empty Abbott Chemical cans to the Abbott Chemical Company. Each can contained a concealed transponder device ("beeper"). This was done with full consent of the Abbott Chemical Company. The cans were then filled with the chemical that had been ordered and placed on a loading dock. Agent Casteele then maintained visual surveillance from the dock and saw a man (later identified as the Defendant Vukson) pick up the two cans and load them into a car. He followed the car to a Holiday Inn in the Chicago area, whereupon a second man (later identified as the Defendant Longo) entered the vehicle.

The car left the Chicago area and was followed by Drug Enforcement Administration representatives, through visual surveillance, to Ann Arbor, Michigan. The transponder device was monitored on only two occasions, and then only for the purpose of ascertaining if it were sending out a signal. The surveillance was not dependent upon "beeper" monitoring.

In Ann Arbor, the Chicago Drug Enforcement Administration agents turned the surveillance activities over to the Detroit based Drug Enforcement Administration agents, including Agent John Graetz. This surveillance continued to be exclusively visual. The Vukson car was followed to 269 Colonial Street in Detroit (the residence of Defendant Longo) where the two five gallon cans were observed being placed in a garage at that address. Shortly thereafter, one of the cans was removed from the garage but the Drug Enforcement Administration agents lost track of the signal emitted by that "beeper," and could not identify the person(s) who removed the can. Consequently, the present Motion only involves the can that remained in the garage.

A twenty-four hour visual and transponder surveillance was maintained at the 269 Colonial address from June 8, 1976 until sometime on June 10, 1976. However, for the next twenty-eight days thereafter, only a periodic surveillance of the "beeper" was conducted. From time to time, Drug Enforcement Administration agents would re-

turn to the Colonial address to determine if the "beeper" were still located at the garage. This was done exclusively by monitoring the transponder signal.

On July 6, 1976, the Drug Enforcement Administration agents once again returned to the Colonial address to determine if the "beeper" were still emitting a signal indicating its continued presence at that location. It was then determined that the "beeper" was no longer located at the Colonial address because only a faint signal was being received. The Drug Enforcement Administration agents then went about the arduous task of locating the can which contained the "beeper." This was done by monitoring the weak signal and tracking it to that point from which the emitted signal was strongest. Eventually, it was determined that the signal was emanating from 529 Greyfriars Street, Detroit, Michigan. The Drug Enforcement Administration agents then made an application for, and obtained, a warrant to search the 529 Greyfriars address.

The Drug Enforcement Administration agents never sought a warrant in Chicago, or in Detroit, for authority to monitor the "beeper." Nevertheless, the Government maintains that it had probable cause to do so.

The antecedent concern raised by any case involving "beeper" surveillance is whether there has been a "search" within the meaning of the Fourth Amendment. Of course, in the event that no "search" is involved, then there is no further need to determine if the warrant requirement, or one of its exceptions, has been satisfied.

The Court believes that the most cogent analytical method for unravelling the Constitutional problems which have been created by this new technological development, is the one adopted by the Eighth and Ninth Circuits.

In addressing the issue of whether use of a transponder [beeper] constituted a search, we adopt the Ninth Circuit's "bifurcated analytical framework" which examines the fourth amendment implications of the installation or attachment of the beeper separately from the fourth amendment implications of monitoring its signal.

*United States v. Bruneau*, 594 F.2d 1190, 1194 (8th Cir. 1979). *See also, United States v. Stone-Chavez*, 603 F.2d 143, 145 (10th Cir. 1979); *United States v. Miroyan*, 577 F.2d 489, 492 (9th Cir. 1978); Note, *Electronic Tracking Devices & Privacy: See No Evil, Hear No Evil, But Beware of Trogan Horses*, 9 Loy.Chi.L.J. 227, 236 (1977). *See generally* Note, *Tracking Katz: Beeper, Privacy, and the Fourth Amendment*, 86 Yale L.J. 1461 (1977).

### INSTALLATION OF THE BEEPER

■ Because the "beeper" involved was installed in the can or barrel of chemical before Vukson had any significant proprietary interest in the same, such an installation cannot properly be considered a Fourth Amendment search. In *Bruneau*, the installation of the beeper on the airplane which had been used by the Defendant was authorized by the express consent of the aircraft's owner. Analagous to that situation, the Abbott Chemical Company permitted the Drug Enforcement Administration agents to have the beeper barrels, provided by the Agency, to be designated the barrels that the Defendants would obtain. *United States v. Bruneau*, 594 F.2d at 1194. Additionally, at least two Circuit Courts have held that the very procedure employed by the Drug Enforcement Administration here does not constitute a search. In *United States v. Hufford*, 539 F.2d 32, 33–34 (9th Cir. 1976), with the consent of a chemical company, the Drug Enforcement Administration agents removed chemical barrels, installed "beepers" within them, and then returned the barrels to the chemical company, designating them as the ones that should be used to fill the Defendants' order. *See also, United States v. Clayborne*, 584 F.2d 346, 348 (10th Cir. 1978).

■ Vukson argues that under the Uniform Commercial Code, 2–501(1), Mich. Comp.Laws Ann. 440.2501(1), a special property interest arose in his favor when the chemicals were identified or when specific

cans were identified as the ones that he would receive. This argument must fail for several reasons. First, the Abbott Chemical Company still had exclusive control and dominion over the "beeper" cans, notwithstanding any special property interest. *Cf. United States v. Miroyan*, 577 F.2d at 493. Therefore, if anyone had lawful authority to consent to the substitution of the "beeper" cans for ordinary cans before they were filled with chemicals, it was the Abbott Chemical Company.

Moreover, identification plays a very limited function under the Code scheme. *See* 2–501 Official Code Comment 4. Consequently, at least under these circumstances, it is particularly difficult to envision how such a limited interest, standing alone, could give rise to a reasonable expectation of privacy in the can, the gravaman of determining whether a search within the Fourth Amendment was involved.

## MONITORING THE BEEPER

### Vehicular Monitoring

Various courts have taken different approaches to the problem raised by monitoring "beeper" signals to survey the movement of motor vehicles and aircraft across public highways or airspace. Both the Eighth and Ninth Circuits have held that use of a "beeper" to follow an airplane or automobile does not constitute a Fourth Amendment search. *United States v. Bruneau*, 594 F.2d 1190, 1194–97 (8th Cir. 1979) (airplane); *United States v. Miroyan*, 577 F.2d 489, 492 (9th Cir. 1978) (airplane); *United States v. Curtis*, 562 F.2d 1153, 1156 (9th Cir. 1977) (airplane); *United States v. Pretzinger*, 542 F.2d 517, 520 (9th Cir. 1976) (airplane); *United States v. Hufford*, 539 F.2d 32, 34 (9th Cir.), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976) (automobile).

As noted by the *Bruneau* Court, *United States v. Bruneau*, 594 F.2d at 1194, only two District Courts have explicitly found to the contrary; and the reasoning of those cases has been somewhat modified on appeal. *United States v. Bobisink*, 415 F.Supp. 1334, 1337 (D.Mass.), *aff'd sub nom.*

*United States v. Moore*, 562 F.2d 106 (1st Cir. 1976); *United States v. Martyniuk*, 395 F.Supp. 42, 44 (D.Or.1975), *aff'd in part and rev'd in part sub nom. United States v. Hufford*, 539 F.2d 32 (9th Cir.), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976). These cases found that such monitoring constituted Fourth Amendment searches which, consequently, had to meet the warrant requirement or one of its exceptions.

An intermediate position has been adopted by the First and Tenth Circuits. Apparently, it is reasoned the intrusion of privacy is of such minimal significance that monitoring can be conducted without a warrant if probable cause exists. *United States v. Clayborne*, 584 F.2d 346, 350–51 (10th Cir. 1978); *United States v. Moore*, 562 F.2d 106, 112–13 (1st Cir. 1976) (this rationale was in part justified on an "automobile exception" to the warrant requirement). It should be noted that this analysis has been criticized. *United States v. Bruneau*, 594 F.2d at 1195–96 & n.11.

■ It is not necessary for this Court to make a determination as to which of these approaches to adopt in the absence of Sixth Circuit precedent. The facts here indicate that the surveillance of the automobile driven by Vukson from Chicago to Detroit was entirely visual. The "beeper" was monitored on only two short occasions, and then only for the purpose of ascertaining if it were emitting a signal. Even if it had been utilized as a supplemental method of surveillance, the visual contact that was maintained throughout the entire journey would have served as an independent and permissible basis for the surveillance, negating any potential constitutional infirmity.

## MONITORING THE COLONIAL RESIDENCE

■ An important factual distinction arises between the monitoring of a "beeper" to follow a moving vehicle traveling on a public thoroughfare and the monitoring of a "beeper" to ascertain its continued presence in a residence.

The present case involves two generic uses of the beepers; first to keep track of the motor vehicles; and, second, to ascertain if the chemicals were still in the house in Brewster. Each of these requires, we believe, separate analysis. . . This does not end the matter, however, since the beeper inside the box of chemicals was used after April 14 to determine the continued presence of the package inside the Brewster residence . . . [A]s the chemicals containing the transmitter were not contraband or otherwise wrongfully in appellees' possession, the Government had no right to determine their continued presence in the house by use of warrantless electronic surveillance . . . Because warrantless use of the beeper inside the box of chemicals to determine their continued presence in the Brewster residence infringed on Defendant's fourth amendment rights, evidence obtained from the searches must be suppressed unless it was come at not by exploitation of the illegality but instead by distinct means which purge the evidence of the primary taint. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

*United States v. Moore*, 562 F.2d 106, 111, 113 (1st Cir. 1976). *Moore*, therefore, established that monitoring a "beeper" secreted within items located in a residence, for the purpose of determining its continued presence there, constitutes a Fourth Amendment search. *See also, United States v. Clayborne*, 584 F.2d 346, 350 (10th Cir. 1978) (court recognized distinction between privacy interests in a house and those in a clandestine laboratory).

■ The Government makes much of the fact that, vis-a-vis Vukson and Longo, there could be no reasonable expectation of privacy by those persons in the search at the Greyfriars address. In language antedating *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), this means that Vukson and Longo have no standing to challenge the Greyfriars search. However, the Defendants have conceded this. Their challenge relates to the search of Greyfriars being imperishably tainted by, and inextricably tied to, the alleged unlawful monitoring of the "beeper" at the Longo residence of 269 Colonial Street. The Court is in complete agreement with this analysis. There is nothing in *Rakas v. Illinois* that could be read as undercutting an extension of the exclusionary rule, established in *Wong Sun v. United States*, to the suppression of the fruits of illegal searches. Consequently, if the monitoring of the "beeper" at Colonial infringed upon the Defendants' Fourth Amendment rights and also tainted the Greyfriars search, the fruits of such must be suppressed unless they were obtained by means sufficiently distinguishable to purge them of the primary taint.

The Government never obtained a warrant to monitor the continued presence of the beeper at the Colonial address from June 10, 1976 until July 6, 1976. Longo clearly had a legitimate expectation of privacy in his residence which includes his home, his garage, his barn or other buildings. *See United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir. 1979); *United States v. Morrow*, 541 F.2d 1229, 1231–32 (7th Cir. 1976) (warrantless search of garage criticized but justified on exigent circumstances ground because stolen vehicle could be removed at any time). Here, the Government has advanced no argument of exigent circumstances to justify the warrantless monitoring of the "beeper." Therefore, the Court can only assume that a warrant should, and could, have been obtained. The Constitution is quite clear that, as a general proposition, a warrant is required for any search unless some legitimate and recognized exception can be made out. Absent such an exception, warrantless searches are *per se* unreasonable. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Hare*, 589 F.2d 1291, 1293 (6th Cir. 1979).

The Government relies upon *United States v. Clayborne*, 584 F.2d 346 (10th Cir. 1978) in its attempt to justify the Greyfriars warrant and search. However, the facts of *Clayborne* are distinguishable from the facts which are presently before the Court. In *Clayborne*, the Drug Enforce-

ment Administration agents had placed a "beeper" within a 55 gallon drum of a chemical precursor to the manufacture of methamphetamines. The Drug Enforcement Administration agents followed the transportation of the drum to the home of one of the Defendants, and the drum was then taken into the house. Later, upon subsequent monitoring, the Drug Enforcement Administration agents determined that the drum had been moved because the "beeper" signal was no longer emanating from the residence. The Drug Enforcement Administration agents then utilized an airplane to pinpoint the new location of the drum within which the "beeper" was secreted. They found that the drum had been taken to commercial premises where a clandestine laboratory was in operation.

The *Clayborne* court distinguished the *Moore* case which, of course, found the warrantless monitoring of a "beeper" located within a residence to have been violative of Fourth Amendment protections.

> In the instant case the beeper surveillance evidence within the house and that within the laboratory *do not come together as one connected transaction. The agents lost contact with the device following the movement from the house.* An independent effort was necessary to establish contact. So the laboratory contact is not tainted by the surveillance within the house.

*United States v. Clayborne*, 584 F.2d at 349–350 (emphasis supplied).

In this case, the monitoring of the "beeper" at the Greyfriars address, which led to the securing of the warrant under attack, *does* come together as one related transaction with the monitoring of the Colonial address. Here, the Drug Enforcement Administration agents did not lose track of the signal which was emitted by the "beeper" when they went to Colonial on July 6, 1976. In fact, by going to the Colonial address, they picked up the faint signal that eventually led them to the Greyfriars location. Because the monitoring of the Colonial residence was a warrantless search, and hence unreasonable *per se*, the only inference that

can be drawn is that the Greyfriars search warrant was imperishably tainted by that illegality. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Court, therefore, will suppress the evidence seized from the Greyfriars address as to the Defendant Longo, the only person whom this record establishes had a reasonable expectation of privacy (standing) in the monitoring of the "beeper" at the Colonial address. This result is in conformity with the principle that the "fruit of the poisonous tree" doctrine (an extension of the exclusionary rule which exacts a substantial social cost for vindication of Fourth Amendment rights. *See Rakas v. Illinois*, 439 U.S. at 177–78 & n.6, 99 S.Ct. 421) is one flowing from the personal Constitutional rights of the Defendant whose privacy rights were originally violated. *United States v. Jackson*, 588 F.2d 1046, 1050 (5th Cir. 1979). *See also United States v. Hunter*, 550 F.2d 1066 (6th Cir. 1977). There being no evidence before the Court as to the Defendant Vukson having any expectation of privacy at Colonial, the Court will deny the Motion as to that Defendant.

It is suggested to the parties that they brief and be prepared to argue whether and on what grounds, the Court could accept a proffer of the seized evidence as to any or all Defendants except Longo.

As to the Defendant Longo, the Motion to Suppress is hereby granted, and as to the Defendant Vukson, the Motion to Suppress is hereby denied.

It is so Ordered.