2 F.3d 1023
 26 Fed.R.Serv.3d 1017
 SOUTHERN UTE INDIAN TRIBE, Plaintiff-Appellant,
v.
AMOCO PRODUCTION COMPANY; Shirley K. Adams; Henry
Ashworth; Carla M. Aspaas; Eric K. Aspaas; Helen Ruth
Aspaas; Laura Belle Aspaas; Leta M. Adkins; Rita M.
Adkins; Maxwell C. Anderson; Earl A. Barker; Maurice C.
Breen, named as: the Heirs of Maurice C. Breen, deceased;
Horace F. Buchanan, named as: the Heirs of Horace Buchanan,
deceased; George A. Bugg; Carbone Investment Company;
Jack Carmack; Rowland Carmack; Joseph C. Ciancio; William
Kemp Clark; Colorado National Bank, George Veto Trust;
Colorado National Bank of Longmont, conservator Gladys N.
Frazzini; Dorothy A. Corgin; Kelly Cox, named as: the
Heirs of Kelly Cox, deceased; A.B. Crosby; Barbara Crosby;
David Crosby; John Crow, Jr.; Margaret Crow; Manuel
Cruz; Louis M. Cummins; Frederick E. Dickerson; J.M.
Eakes; Robert McFerran Eakes; Margaret Ellison; Sally M.
Etterbeck; Minnie Flaks; Tillie Flaks; Cassio Frazzini;
Adele Frost; Robert Galbasin; Abel S. Gallegos; Montey
Garnand; Ruby Gibbs Goggans; Christine Hamilton; Hardin
Simmons University; H.A. Harmon, named as: the Heirs of
H.A. Harmon, deceased; Catherine Frances McElvain Harvey;
Hondo Oil & Gas Company, named as: the shareholders of
Hondo Oil & Gas Company (dissolved); Hyde Oil and Gas
Corporation; Charles Kettering; Fidel Lucero; Richard C.
Malcomb; Suzanne Heath Manges; Catherine B. McElvain;
Mabel McElvain; Thornton H. McElvain, Jr.; Dorothy N.
McKelvey; Edwin L. McKelvey; R. Franklin McKelvey; W.R.
McMahon; McMurry Oil Company; W. Clay Meredith Charitable
Trust; W.A. Moncrief, named as: the Heirs of W.A.
Moncrief, deceased; Roy E. Montgomery, personal
representative for the Estate of W. Clay Meredith, deceased;
Forrest D. Miller, named as: the Heirs of Forrest D.
Miller, deceased; Helen L. Miller, named as: the Heirs of
Helen L. Miller, deceased; Thomas S. Morrissey; Thomas J.
Morrissey; Emil Mosbacher; Emil Mosbacher, III; John
David Mosbacher; R. Bruce Mosbacher; Myra Theresa Moulds;
North Central Oil Corporation; H.L. Oliver; Clara Onofrio;
Margaret C. Pargin; Harold F. Payne, Jr.; Neville G.
Penrose; Ben M. Peterson, Jr.; Frederick Petrocco;
Phillips Petroleum Company; James M. Raymond; W.E. Rennie,
named as: the Heirs of W.E. Rennie, deceased; Thomas C.
Romolo; Benton E. Smullyen; Clinton I. Smullyen; William
Stirling; J.L. Tatum, named as: the Heirs of J.L. Tatum,
deceased; Anna Carleo Tomeo; Ernest Tomeo; Turner
Securities; Richard W. Turner, Sr.; George C. Vance, named
as: the Heirs of George C. Vance, deceased; Anthony H.
Veto; Joseph F. Ware, Jr.; Albert E. Zarlengo; Anthony F.
Zarlengo, John Doe and all other unknown persons claiming an
interest in the mineral estate located within the N/2 of
section 12, T33N, R8W, N.M.P.M., La Plata County, Colorado;
AMAX Oil & Gas, Inc.; Bowen/Edwards Associates, Inc.;
Conoco, Inc.; Fuel Resources Development Company; Markwest
Energy Partners Limited; McKenzie Methane Corporation;
Meridian Oil, Inc.; Mobil Oil Corporation; National
Cooperative Refinery Association; Northwest Pipeline
Corporation; Pablo Operating Company; Palo Petroleum,
Inc.; Palo/Eagle Joint Ventures; Richmond Petroleum, Inc.;
Tiffany Gas Company; Williams Production Company; Union
Texas Petroleum Corporation, John Doe oil company and all
other unknown persons or entities claiming leasehold
working interests or operating rights to explore for,
produce or develop coalbed methane or coal constituents from
coal or coal strata reserved by the United States in patents
issued under The Act of June 22, 1910, for lands located
within the exterior boundaries of the Southern Ute Indian
Reservation, and which entities have not obtained tribal
consent to and federal approval of said exploration,
production of development activities; Manuel Lujan, Jr.,
Secretary of the United States Department of the Interior;
Department of Interior, and its subordinate agencies;
Bureau of Indian Affairs; Bureau of Land Management;
Minerals Management Service; Eddie F. Brown, Assistant
Secretary of the Bureau of Indian Affairs; Delos Cy
Jamison, Director of the Bureau of Land Management; Scott
S. Sewell, Director of the Minerals Management Service;
Class of Defendants situated similarly to those named
non-governmental defendants who claim ownership of an
interest in coalbed methane and other coal constituents or
claim the right to explore for, develop or produce those
substances from coal or coal strata reserved by the United
States in patents issued under the Act of March 3, 1909, or
the Act of June 22, 1910, for lands located within the
exterior boundaries of the Southern Ute Indian Reservation
and which class members have not obtained tribal consent to
and federal approval of said interests of rights; J.M.
Huber Corporation, Oil & Gas Division, Defendants-Appellees.
 No. 92-1201.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 10, 1993.
 
 Scott B. McElroy (Bruce R. Greene and M. Catherine Condon of Greene, Meyer & McElroy, P.C., Boulder, CO, Thomas H. Shipps and Frank E. (Sam) Maynes of Maynes, Bradford, Shipps & Sheftel, Durango, CO, with him on the brief), of Greene, Meyer & McElroy, P.C., Boulder, CO, for plaintiff-appellant.
 Anthony J. Shaheen (Thomas S. Nichols and Charles L. Kaiser of Davis, Graham & Stubbs, Denver, CO, David E. Brody of Amoco Production Co., Denver, CO, with him on the brief), of Davis, Graham & Stubbs, Denver, CO, for defendant-appellee.
 Before SEYMOUR and MOORE, Circuit Judges, and THEIS,* District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 Southern Ute Indian Tribe (Tribe) sued Amoco Production Company (Amoco) and other oil companies and individuals, claiming they were extracting from their oil and gas leases coalbed methane reserved by the United States for the benefit of the Tribe. The district court certified a defendant class,[1] and also issued a cost allocation order requiring the Tribe to pay the oil companies 25% of the companies' cost of mineral and land title examinations from which the Tribe desired to obtain names in order to notify the class defendants. Amoco asserts that we lack jurisdiction to hear the appeal. We conclude we have jurisdiction, and we reverse the district court's cost allocation order.
 
 I.
 
 2
 The underlying dispute here concerns ownership of coalbed methane found in coal strata, located on the Southern Ute Indian Reservation in southwest Colorado. Although some lands at issue in this action were patented to non-Indians, the coal underlying the lands was reserved by the United States under the Act of March 3, 1909, ch. 270, 35 Stat. 844 (codified at 30 U.S.C. Sec. 81) or under the Coal Lands Act of 1910, ch. 318, 36 Stat. 583 (codified at 30 U.S.C. Secs. 83-85). In 1938, Congress restored the unpatented land on the reservation to trust status for the benefit of the Tribe. Act of June 28, 1938, ch. 776, 52 Stat. 1209, 1210-11. The coal which had previously been reserved was restored in trust to the Tribe under the Order of Restoration of September 14, 1938, entered pursuant to 25 U.S.C. Sec. 463.
 
 
 3
 An estimated 20,000 individuals hold interests in the oil and gas estates underlying approximately 200,000 acres of land in which the Tribe owns the coal interests. Amoco owns oil and gas leasehold interests covering approximately 150,000 acres, and is the operator of approximately 160 coalbed methane wells. The other corporate defendants are the lessees and operators of approximately 190 wells. The issue in the lawsuit is who is entitled to develop the coalbed methane, the owner of the coal or the owners of the oil and gas. The Tribe claims that coalbed methane is an integral component of the coal held in trust for the Tribe, and that defendant oil companies are extracting this coalbed gas without the Tribe's consent and without compensation.
 
 
 4
 The Tribe named over one hundred defendants in its complaint and also sought certification of a defendant class which would include the more than 20,000 persons with various interests in the oil and gas. In a joint motion, the Tribe and Amoco moved to resolve class definition and class certification, among numerous other case management issues. App., vol. I, at 110 (joint motion). The joint motion proposed class certification of two issues only: (1) ownership of the coalbed methane; and (2)
 
 
 5
 a determination of whether there exist defenses generally applicable to the defendant class, consisting of statutes of limitation, and estoppel, promissory estoppel, waiver, contractual limitations, consent, acquiescence, ratification, laches and good faith to the extent that these defenses, other than statutes of limitation, are based on the acts or omissions of the Tribe or its agents, employees, or representatives.
 
 
 6
 Id. at 113. The trial court certified a defendant class pursuant to Rule 23(b)(2) solely to determine the two described issues. Id., vol. II, at 224 (Case Management Order).
 
 
 7
 After the joint motion was filed, only three defendant oil companies objected to the proposed class certification. Id. at 211 (Amoco's Response to Objections to Proposed Case Management Order). A number of defendants specifically joined the class certification proposal. In responding to the objections, Amoco asserted that "the procedural device of a defendant class is useful and appropriate here, and lends itself well to the protection of the interests of all parties and class members and to the efficient conduct of the litigation." Id. at 216.
 
 
 8
 In its objection, Meridian Oil argued that a class of defendants should not be certified without first providing notice to the unnamed members of the class and offering them an opportunity to object. In its response to Meridian, the Tribe contended that certification of a defendant class was appropriate under either Rule 23(b)(1) or (b)(2). Notice is required to be given to the class only if it is certified under Rule 23(b)(3). See Fed.R.Civ.P. 23(c)(2). The Tribe recognized, however, that due process considerations had been raised in some Rule 23(b)(1) and (b)(2) cases and concluded that "[i]t would appear that a similar notice requirement may be necessary in this action."[2] App., vol. II, at 192-93 (Tribe's Response to Opposition to Meridian). The Tribe then said it was prepared to send notice to the proposed defendant class, but that the only practical way to obtain the names of all class members was to request that each defendant oil company produce a list of the names and addresses of those individuals shown by the companies to claim an interest in lands and minerals affected by the lawsuit. The Tribe filed a motion to supplement the proposed case management order, requesting a mechanism for the Tribe to discover individuals and entities who claim an interest in relevant lands in order to send the class notice, and pointing out that "each of the oil company defendants maintain lists of owners with interests related to those lands." Id. at 194 (Plaintiff's Motion to Supplement Case Management Order No. 1). The list of names had been acquired earlier by the oil companies as part of their ongoing business operations.
 
 
 9
 In its objection to the Tribe's proposed supplemental order, Richmond Petroleum opposed allowing the Tribe to obtain these lists from the oil company defendants without paying some compensation to those companies. Richmond Petroleum asserted:
 
 
 10
 Any lists that any oil company defendants have would have been obtained by ordering abstracts covering the county records for the lands in question or checking the records themselves, and obtaining title opinions at great expense to the defendant oil companies.
 
 
 11
 It is unconscionable to allow the Tribe to obtain these lists from oil company defendants via discovery requests when the oil company defendants have expended vast sums of money to obtain these lists. The Tribe should not have free use of the lists without some form of compensation to the oil company defendants.
 
 
 12
 Supp.App. at 50-51.
 
 
 13
 The district court held a hearing on April 24, 1992, to consider the joint motion to adopt a case management order and the Tribe's request to supplement that order. Amoco and the Tribe had prepared Case Management Order No. 1, which was proposed to the court. The Tribe had prepared a proposed supplemental order that stated the Tribe would send notice to the defendant class and that provided for discovery of the ownership lists. The court signed both orders. However, in response to Richmond's objection regarding the costs of compiling the list, the court interlineated the Tribe's prepared order with a handwritten modification that required the Tribe to pay 25% of the costs previously expended by the oil companies in compiling their lists of owners of oil and gas interests. In entering the orders, the court stated:
 
 
 14
 I am going to enter on the record to be supplemented in the future by a more detailed written order if not a memorandum opinion and order, but I am going to enter upon the record these preliminary findings and conclusions which are based in part upon my opening remarks to counsel.
 
 
 15
 App., vol. II, at 246.
 
 
 16
 The Tribe subsequently asked the court to reconsider its earlier modification, pointing out that the court's ruling was made without any discussion of the magnitude of the costs being imposed on the Tribe. The Tribe estimates the cost to be in excess of $500,000. On June 24, 1992, the court entered an order denying the Tribe's motion and setting out the authorities and analysis underlying its decision to allocate costs. Id. at 309. The Tribe filed a notice of appeal on July 2, 1992, appealing from the June 24 order.
 
 II.
 
 17
 We must first determine whether we have jurisdiction over this appeal. Amoco argues that the cost allocation order is not a final, appealable order under 28 U.S.C. Sec. 1291 (1988) and does not fall within any exception to the final judgment rule. Specifically, Amoco maintains that whether a collateral order is appealable is determined under the test articulated by the Supreme Court in Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978), which followed Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and set out a three part test for examining whether a collateral order falls within an exception to the final judgment rule. Amoco asserts that the order appealed here does not meet the Coopers & Lybrand test.[3]
 
 
 18
 The Tribe counters that the cost allocation order is appealable under Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 347 n. 8, 98 S.Ct. 2380, 2387 n. 8, 57 L.Ed.2d 253 (1978) (order allocating expense of identifying class members held appealable under collateral order doctrine of Cohen ), which followed Eisen v. Carlisle & Jacquelin (Eisen IV), 417 U.S. 156, 171-72, 94 S.Ct. 2140, 2149-50, 40 L.Ed.2d 732 (1974) (same). According to Amoco, however, the Tribe's reliance on Eisen IV and Oppenheimer is in error because the Coopers & Lybrand test is the most recent restatement of the Cohen collateral order doctrine, and Coopers & Lybrand narrows the Cohen formulation.
 
 
 19
 We disagree with Amoco's assertion that Coopers & Lybrand somehow undermined Eisen IV and Oppenheimer. In a footnote to the formulation of the test in Coopers & Lybrand, 437 U.S. at 468 n. 10, 98 S.Ct. at 2458 n. 10, the Court quoted its summarization of the rule in Cohen, indicating that it was merely applying Cohen to the case before it rather than altering the rule. The Court quoted from Eisen IV while describing the Cohen requirements and immediately preceding the text of the Coopers & Lybrand test. See id. at 468 & n. 9, 98 S.Ct. at 2458 & n. 9. In Eisen IV, the Court had held that a district court order allocating the costs of class notice was immediately appealable under the collateral order doctrine of Cohen. 417 U.S. at 169-72, 94 S.Ct. at 2148-50. The Court gave no hint in Coopers & Lybrand that it intended to change the outcome of Eisen IV.[4]
 
 
 20
 Most significantly, Coopers & Lybrand was decided only two days after Oppenheimer. In Oppenheimer, the Court granted certiorari to consider whether Rule 23(d) empowers district courts to require a defendant in a class action to assist the plaintiff in identifying class members, and whether the defendant can also be ordered to participate in the costs of performing that task. The Court explicitly stated that the cost allocation order was immediately appealable under Cohen. Oppenheimer, 437 U.S. at 347 n. 8, 98 S.Ct. at 2387 n. 8.[5] We will not hold that the Supreme Court's acceptance of jurisdiction over the collateral order in Oppenheimer was completely undermined two days later by its pronouncement in Coopers & Lybrand, as Amoco would have us do.[6] We can find no meaningful distinction between this case and Eisen IV or Oppenheimer for jurisdictional purposes. We therefore conclude that we have jurisdiction over the cost allocation order. See In re Victor Technologies Sec. Litig., 792 F.2d 862, 863-64 (9th Cir.1986); but see Judd v. First Fed. Sav. & Loan Ass'n, 599 F.2d 820 (7th Cir.1979) (per curiam) (holding, without citing Oppenheimer, that order on costs of notice not appealable).
 
 III.
 
 21
 Amoco alternatively argues that even if the district court's collateral order is one over which we have appellate jurisdiction, our review is limited by the standard we apply to the denial of a motion for relief under Fed.R.Civ.P. 60(b). The district court modified and signed the Tribe's proposed supplemental order on April 24. The Tribe filed its motion for reconsideration on May 15, more than ten days later. Consequently, the motion for reconsideration was not a timely motion under Fed.R.Civ.P. 59(e) that would have tolled the time for appeal under Fed.R.App.P. 4(a)(4). Amoco contends, therefore, that the motion to reconsider falls under Rule 60(b), and that the merits of the cost award are consequently not before us. If that is the case, we may only address whether the lower court abused its discretion in denying the Tribe's motion to reconsider. See, e.g., Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., Inc., 909 F.2d 1437, 1439-40 (10th Cir.1990) (appeal from denial of Rule 60(b) motion limited to ascertaining whether district court abused its discretion in finding no exceptional circumstances justified relief from judgment).
 
 
 22
 We do not agree with Amoco that the district court's order denying reconsideration must be deemed the denial of a Rule 60(b) motion. Such an argument would be valid only if the court's earlier order allocating costs were final for purposes of appeal. Our review of the record and authorities persuades us that the district court's first order was not final and that the time for taking an appeal did not begin to run upon entry of that order.
 
 
 23
 "An appeal taken under the collateral order doctrine is subject to all the usual appellate rules and time periods, including Rule 4 of the Federal Rules of Appellate Procedure." United States v. Moats, 961 F.2d 1198, 1203 (5th Cir.1992); see also Kennedy v. City of Cleveland, 797 F.2d 297, 301 (6th Cir.1986), cert. denied, 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987); 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice p 110.21 (2d ed. 1993). An order that otherwise fits within the collateral order doctrine is not appealable if it is not the final determination of the district court on the collateral issue. The Supreme Court in Cohen pointed out that an appeal is not allowed "from any decision which is tentative, informal or incomplete.... So long as the matter remains open, unfinished or inconclusive, there may be no intrusion by appeal." 337 U.S. at 546, 69 S.Ct. at 1225; see also 15A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure Sec. 3911, at 333 (2d ed. 1992).
 
 
 24
 We have described above the process whereby the district court signed the prepared case management order and the supplemental order at the April 24 hearing. The court declared that it was doing so preliminarily and would enter a more detailed written order, which it did on June 24. Given this scenario, we hold that the April 24 order was not the final cost allocation order for purposes of appeal. As we have said, an order is not final under the collateral order doctrine if it is incomplete or if the matter remains open or unfinished. "To be final and appealable, the district court's judgment must end the litigation and leave nothing to be done except to execute the judgment." In re Glover, Inc., 697 F.2d 907, 909 (10th Cir.1983). In this case, the court itself viewed the April 24 order as preliminary rather than final. It is clear that the court intended to consider the matter further even before the Tribe filed its motion to reconsider. We view the Tribe's motion not as reopening a matter that the court had finally decided but as attempting to present its position to the court before a final decision was made.
 
 
 25
 Because the April 24 order was not final, it did not trigger the running of the time for filing a notice of appeal. The June 24 order, which contained the court's reasoning and authorities and which fulfilled the court's earlier commitment to supplement its preliminary ruling with a more detailed written order, is the order which finally terminated the issue of cost allocation and left nothing to be done but to execute the order. Accordingly, that order, rather than the one entered on April 24, is the final order for purpose of appeal. The Tribe's notice of appeal was filed within thirty days of that order, thereby conferring appellate jurisdiction over the merits of the cost allocation decision.
 
 IV.
 
 26
 We turn now to the underlying merits of the order allocating to the Tribe 25% of the costs previously incurred by defendant oil companies in the ordinary course of business. The district court "so ordered because the defendant oil companies compiled this information for their own business purposes and, presumably, used the information to their economic benefit prior to the filing of this case." App., vol. II, at 310. Amoco and the district court view the order as relieving the Tribe of 75% of the cost that ordinarily it would be expected to bear in notifying the class, rather than as imposing 25% of the cost on the Tribe. See id. Amoco contends this was a proper exercise of the district court's discretion.
 
 
 27
 A class action plaintiff is ordinarily expected to bear the cost of notice to the class. Eisen IV, 417 U.S. at 178-79, 94 S.Ct. at 2152-53. Nevertheless, the district court has discretion to allocate costs to the defendant for tasks that the court has appropriately ordered the defendant to perform. Oppenheimer, 437 U.S. at 350, 355-56, 358, 98 S.Ct. at 2389, 2391-92, 2393. The Court recognized in Oppenheimer that "[i]n some instances, ... the defendant may be able to perform a necessary task with less difficulty or expense than could the representative plaintiff." id. at 356, 98 S.Ct. at 2392.
 
 
 28
 If the defendant is to perform the task, the issue then becomes who should bear the expense. In analyzing the situation, the Court in Oppenheimer analogized to the rules of discovery.
 
 
 29
 [A] rough analogy might usefully be drawn to practice under the discovery rules. Under those rules, the presumption is that the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from "undue burden or expense " in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery. The analogy necessarily is imperfect, however, because in the Rule 23(d) context, the defendant's own case rarely will be advanced by his having performed the tasks. Thus, one of the reasons for declining to shift costs under Rule 26(c) usually will be absent in the Rule 23(d) context. For this reason, a district court exercising its discretion under Rule 23(d) should be considerably more ready to place the cost of the defendant's performing an ordered task on the representative plaintiff, who derives the benefit, than under Rule 26(c). In the usual case, the test should be whether the expense is substantial, rather than, as under Rule 26(c), whether it is "undue."
 
 
 30
 Id. at 358, 98 S.Ct. at 2393 (emphasis added) (citation and footnote omitted). The Court then said "it may be appropriate to leave the cost where it falls because the task ordered is one that the defendant must perform in any event in the ordinary course of its business." Id.
 
 
 31
 Two points from the above quotations stand out in the context of the present case. First, although the Tribe initially proposed the defendant class here, Amoco and the great majority of named defendants readily agreed that such a class was appropriate. Amoco jointly moved for class certification, sought to represent the defendant class, and countered the objections of the three dissenting defendants with the assertion that the proposed class would protect the interests of the class members. Compare Note, Defendant Class Actions, 91 Harv.L.Rev. 630, 648 (1978) ("Defendants generally oppose motions to certify them as class representatives."). Most significantly, one of the two issues certified for class determination is whether there are common class defenses that will defeat the Tribe's claim. That issue will benefit only defendants. As the district court stated in its order approving the joint motion, "[i]f Amoco defeats the Tribe's ownership claims, then all class members benefit. Likewise, if Amoco prevails on any of the common defenses, then all class members benefit." App., vol. II, at 319. This is not the usual case, then, in which there is a plaintiff class and only the plaintiffs will benefit from the class action; here defendants are the class and they will benefit.
 
 
 32
 Second, this is not a situation in which the defendants will be required to perform any task other than to turn over lists of names and addresses they already have. The data in question was previously assembled by defendant oil companies in the ordinary course of business. The oil companies had to ascertain who had claims to land, minerals, and other substances before they could drill. Thus, this situation fits precisely the Supreme Court's admonition that it may be appropriate to leave the cost where it falls.
 
 
 33
 Moreover, we have difficulty viewing this as a cost-of-notice issue at all. The Tribe has been ordered to pay 25% of one of the costs defendant oil companies have incurred in doing business. The Court in Oppenheimer discussed "which party should perform particular tasks necessary to send the class notice." Oppenheimer, 437 U.S. at 356, 98 S.Ct. at 2392. Amoco maintains that the task is collection of the title data comprising the names and addresses of potential class action defendants. But that task has already been done. Defendants performed that task prior to this litigation and had to do so to operate their respective oil and gas businesses. The particular tasks necessary to send the class notice in this case are instead the assembling of the names from defendant oil companies and transferring them to the Tribe. The costs associated with these tasks are typical cost-of-notice tasks. The Tribe has already agreed to pay those costs, as well as the other costs of notice including mailing.
 
 
 34
 We agree with the Tribe that it should not be required to pay for the past cost of acquiring information already in the possession of defendant oil companies as a result of their ordinary business operations. This is particularly so when the cost is enormous, as here, and when defendants for the most part favor the formation of defendant class and will also benefit from it. In the present case where the cost to the Tribe of assembling the data anew would amount to more than two million dollars and where defendants have at their disposal the exact list the Tribe seeks, it would clearly be an abuse of discretion for the district court to order the Tribe to reproduce the list. Defendants have cited no case in which the proponent of a class was ordered to reimburse a defendant for costs expended in the ordinary course of business in order to obtain information needed to send the class notice. Under the unusual circumstances of this case, we are convinced it was an abuse of discretion for the district court to order the Tribe to reimburse defendants for 25% of the costs they incurred in the operation of their businesses. To the extent defendants are concerned that the information could be used for purposes other than notice, the district court has authority to issue a protective order to address defendants' proprietary concerns. See Fed.R.Civ.P. 26(c)(7) (district court may order commercial information disclosed only in designated way).
 
 
 35
 We REVERSE the order of the district court requiring the Tribe to pay to defendants 25% of costs already expended by defendants to acquire necessary business information. We REMAND the matter to the district court for further proceedings.
 
 
 
 *
 Honorable Frank G. Theis, Senior District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Amoco was designated by the district court as representative of the defendant class, and its counsel as lead counsel
 
 
 [2]
 The district court has authority under Fed.R.Civ.P. 23(d)(2) to require notice it deems necessary
 
 
 [3]
 Under the Coopers & Lybrand test, for a collateral order to be excepted from the final judgment rule, "the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)
 
 
 [4]
 The Court in Coopers & Lybrand also quoted from Eisen IV when discussing the legislative judgment underlying the finality requirement. Coopers & Lybrand, 437 U.S. at 471, 98 S.Ct. at 2459
 
 
 [5]
 The Second Circuit, in fact, had determined that the collateral order there was appealable by analyzing the order under two of the three steps the Court subsequently articulated in Coopers & Lybrand. See Sanders v. Levy, 558 F.2d 636, 638 (2d Cir.1976), rev'd on other grounds sub nom., Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). Whether the order was an "important issue" was not addressed by Sanders. We hold that the magnitude of costs involved, as well as whether a class action plaintiff must pay for a defendant's preexisting files beyond the regular costs of notice, constitute sufficiently important issues to meet the Coopers & Lybrand test
 
 
 [6]
 In 15A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3911 at 347 (1992), the commentators note that the "Supreme Court decisions establish the general contours of collateral order doctrine, even as they permit one element or another to be subordinated." They point out that the three-part test in Coopers & Lybrand "is no more than a useful starting point for analysis," id. at 351, and that " 'as with so many multi-"pronged" legal tests it manages to be at once redundant, incomplete, and unclear,' " id. (quoting Palmer v. City of Chicago, 806 F.2d 1316, 1318 (7th Cir.1986), cert. denied, 481 U.S. 1049, 107 S.Ct. 2180, 95 L.Ed.2d 836 (1987)). While Eisen IV and Oppenheimer may not fit neatly within the three-part test of Coopers & Lybrand, they remain directly applicable Supreme Court authority for jurisdiction in this case